# United States Court of Appeals
## For the First Circuit

No. 07-2419

UNITED STATES,

Appellee,

v.

ARMAN TER-ESAYAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. William E. Smith, U.S. District Judge]

Before

Toruella, Baldock,* and Lipez,
Circuit Judges.

Eugene Patrick Harris, with whom Mark J. Geragos and George G. Buehler were on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Lee H. Vilker, Assistant United States Attorney, were on brief, for appellee.

June 26, 2009

*Of the Tenth Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  Arman Ter-Esayan appeals the 72-month sentence he received after pleading guilty, pursuant to a written plea agreement, to a two-count criminal information charging him with conspiracy to commit access device fraud and aggravated identity theft.  The government asks us to dismiss this appeal because Ter-Esayan waived the right to appeal his sentence in the plea agreement.  Ter-Esayan argues that we should disregard that waiver and proceed to examine his claim that the district court improperly construed the definition of "victim" under U.S.S.G. § 2B1.1, and thereby increased his sentence.  We conclude that Ter-Esayan validly waived his right to appeal the guideline sentence imposed by the district court, and that enforcing the waiver would not work a "miscarriage of justice" in light of the decision filed today in the related case of United States v. Stepanian, No. 08-1053, slip op. at 8 (1st. Cir. June 26, 2009).  Therefore, we dismiss this appeal.

I.

Although we have recounted the undisputed facts of this case in Stepanian, No. 08-1053, slip op. at 2-4, we repeat them here.  Beginning in January 2007, appellant and three co-conspirators -- Mikael Stepanian, Arutyun Shatarevyan, and Gevork Baltadjian -- engaged in a plan to steal debit card numbers, personal identification numbers ("PINs"), and credit card numbers from the customers of 24-hour Stop & Shop grocery stores in Rhode

-2-

Island. To accomplish this, they surreptitiously replaced the credit and debit card payment terminals in Stop & Shop checkout aisles with altered terminals. The altered terminals were equipped with a device that recorded debit card numbers, PIN codes, and credit card numbers whenever customers swiped their cards to make a purchase.

After returning to the targeted stores to retrieve a converted payment terminal and replacing it with the store's original terminal, the co-conspirators possessed the private account information of every customer who had used the compromised terminal during the intervening period. The men were able to use the stolen information to make unauthorized transactions, including cash withdrawals from automatic teller machines ("ATMs"). Their unauthorized transactions totaled roughly $132,300.

The scheme was discovered when one bank's internal investigation of unauthorized ATM withdrawals revealed that many affected account holders had recently used their cards at Stop & Shop stores in Coventry and Cranston, Rhode Island.[1] Stop & Shop security personnel soon located surveillance video showing appellant, Baltadjian, and Shatarevyan entering the Cranston store in the early hours of the morning on February 1, 2007. While

---

[1] The investigation was also aided when one of the altered terminals malfunctioned and was sent out of the store for servicing. When it was opened for repairs on February 13, 2007, it was discovered that card-skimming equipment had been placed inside the terminal.

Baltadjian engaged the night clerk in conversation, appellant and Shatarevyan approached the credit card terminal in a deserted checkout aisle. Shatarevyan quickly disconnected the original terminal from its cables and handed it to appellant, who concealed it in his coat. Shatarevyan then removed a second terminal from his own coat and connected it to the cables. Stop & Shop surveillance personnel located similar footage of the three men switching terminals in the Coventry and Providence, Rhode Island stores. As revealed by the surveillance video, the process of substitution only took about twelve seconds.

On February 26, 2007, Stop & Shop employees at one of the targeted stores recognized the co-conspirators from the surveillance video and called the police. The responding officers arrested appellant, Baltadjian, and Shatarevyan inside the store. They also arrested Stepanian, who was sitting behind the wheel of a vehicle parked immediately outside the store's exit. Police later searched a nearby hotel room that had been rented in Stepanian's name, where they found materials used to alter the credit card terminals and a laptop containing the private account information of customers who had shopped at the Cranston and Coventry Stop & Shop stores.

On May 21, 2007, appellant signed a written plea agreement in which he agreed to plead guilty to: 1) conspiracy to violate 18 U.S.C. § 1029(a)(2) by trafficking in and using one or

-4-

more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 371 (Count I), and 2) knowing transfer, possession, or use of other persons' means of identification in relation to the felony offenses of access device fraud, 18 U.S.C. § 1029(a)(2) and (3), and conspiracy to commit access device fraud, 18 U.S.C. §§ 371, 1029(b)(2), constituting aggravated identity theft in violation of 18 U.S.C. § 1028A (Count II). The plea agreement contained a provision stating that Ter-Esayan understood that "the Court alone [would make] all sentencing decisions, including the application of the Guidelines and the sentence to be imposed," and that appellant would not be able to withdraw his guilty plea even if the court's sentence was not what he expected. The agreement also contained a waiver of appellant's right to appeal his sentence, which read in pertinent part: "Defendant understands that Defendant may have the right to file a direct appeal from the sentence imposed by the Court. Defendant hereby waives Defendant's right to file a direct appeal, if the sentence imposed by the Court is within the guideline range determined by the Court or lower."

In paragraph two of the written agreement, the government agreed to: 1) recommend a two- to three-level reduction in the appellant's offense level, 2) recommend that the court impose a sentence at the low end of the guidelines range, and 3) not seek an adjustment based on Ter-Esayan having played an aggravating role in

the offense. The agreement was silent about whether the government would suggest an enhancement for the number of victims of the offense, and further specified that, "[e]xcept as expressly provided in paragraph 2 above, there is no agreement as to which Offense Level and Criminal History Category applies in this case."

At a plea hearing on May 30, 2007, the district court questioned Ter-Esayan to ensure that he understood both the charges against him and the terms of the written plea agreement. The court confirmed that Ter-Esayan understood that any sentencing recommendations made by the government were not binding and that, if the court chose not to accept the recommendations, he would not be able to change his plea. The court also inquired about Ter-Esayan's waiver of appeal:

> **The Court**: I also want to draw your attention to paragraph 13 of your plea agreement, which provides that you may and normally have a right to appeal a sentence imposed by the Court, but you are agreeing to waive your right to appeal if the sentence I impose is within the guideline range or lower. Now, you . . . understand that?
>
> **Mr. Ter-Esayan**: Yes, your honor.

After finding that he was competent to enter a plea and that his plea was knowing and voluntary, the district court accepted appellant's guilty plea.

A presentence report ("PSR") prepared by the Probation Office stated that the guideline total offense level ("TOL") for

-6-

Count I, access device fraud, was 23. This calculation included a base offense level of 6, a ten-level upward adjustment for crimes involving a loss of more than $120,000 but less than $200,000, a six-level upward adjustment for crimes involving 250 or more victims, a two-level upward adjustment for use of sophisticated means, a two-level upward adjustment for the production or trafficking of an unauthorized access device, and a three-level downward adjustment for acceptance of responsibility. In conjunction with appellant's criminal history of Category I, this TOL produced a guideline sentencing range of 46 to 57 months. As for Count II, aggravated identity theft, the PSR noted that a two-year consecutive sentence was prescribed by statute.

At his sentence hearing, appellant objected to the PSR's calculation of the number of victims of the offense. He argued that the six-level increase for crimes against more than 250 victims was inappropriate because only Stop & Shop and the 26 financial institutions that had ultimately reimbursed the defrauded bank account holders were "victims" for the purpose of the multiple victim enhancement. According to Ter-Esayan, account holders who had been reimbursed by their banks could not be victims under the relevant guideline provision because it defines the term to include only those who have sustained foreseeable economic loss and specifically excludes those who have suffered only "emotional distress, harm to reputation, or other non-economic harm."

U.S.S.G. § 2B1.1, cmt. nn. 1, 3(A). Appellant therefore urged the court to impose only the two-level multiple victim enhancement applicable to crimes involving 10 to 50 victims.[2] He pointed to a Sixth Circuit decision, United States v. Yagar, 404 F.3d 967 (6th Cir. 2005), to support his position.

In response to appellant's objection, the government countered that some account owners had reported serious financial consequences from the unauthorized withdrawals even though they were ultimately reimbursed by their banks. The government described one account owner who temporarily did not have enough money to buy food and gas for his family, and another who had been forced to borrow $500 from a family member to make ends meet.[3] The government cited an Eleventh Circuit case, United States v. Lee, 427 F.3d 881 (11th Cir. 2005), in support of its reading of "victims" as including the individual account holders even if they only sustained temporary financial loss.

Acknowledging a circuit split on the issue, the district court agreed with the Sixth Circuit's decision in Lee, and found that the victims included 238 individuals, 26 banks, and the Stop

---

[2] Appellant's calculation of the number of victims would result in an offense level of 19 for Count I, which, in conjunction with his criminal history of Category I, would yield a sentencing range of 30-37 months.

[3] At sentencing, appellant argued that only seven individual bank account holders had reported suffering any kind of temporary financial hardship.

& Shop chain. Those numbers resulted in a six-level multiple victim enhancement. The court adopted the PSR's guideline calculation and sentenced Ter-Esayan to the low end of the guideline range for Count I, 48 months, with a consecutive 24-month sentence on Count II. Ter-Esayan now appeals his sentence, arguing that his appeal waiver should not be enforced and that his sentence must be vacated because the district court misunderstood the term "victim" under section 2B1.1.

## II.

Our initial inquiry must be whether to enforce appellant's waiver of the right to bring this appeal. In determining whether to enforce a waiver of the right to appeal, we use the three-tiered analysis set forth in United States v. Teeter, 257 F.3d 14 (1st Cir. 2001). See, e.g., United States v. Chandler, 534 F.3d 45 (1st Cir. 2008); United States v. Edelen, 539 F.3d 83 (1st Cir. 2008). First, we consider whether the written plea agreement "contains a clear statement elucidating the waiver and delineating its scope." Teeter, 257 F.3d at 24. Next, we examine the transcript of the plea hearing to determine whether the trial court specifically inquired into the waiver of appellate rights to ensure that the defendant "freely and intelligently" waived his right to appeal. Id. Finally, we consider whether enforcing the waiver would "work a miscarriage of justice." Id. at 25.

Appellant argued in his brief that the language of his plea agreement did not clearly delineate the scope of the waiver. The written plea agreement stated that appellant waived his right to appeal the sentence imposed by the court if it was "within the guideline range determined by the Court or lower." After the submission of appellant's brief and before oral argument in this case, we decided in Chandler, 534 F.3d at 49, that language nearly identical to that in appellant's plea agreement sufficiently delineated the scope of a waiver of appellate rights and therefore passed the first stage of the Teeter inquiry. As a result, appellant conceded at oral argument that the language of his plea agreement had adequately delineated the scope of the waiver. Therefore, the first prong of the Teeter test is not at issue.

The waiver also passes the second prong of the Teeter inquiry. At the change-of-plea hearing the district court ensured appellant's waiver was made "freely and intelligently" by inquiring into whether appellant was aware that he would otherwise have had the right to appeal and that he was waiving that right. Appellant responded, "Yes, your Honor."

Thus, appellant's only argument for the unenforceability of his waiver of the right to appeal is that enforcing the waiver would constitute a miscarriage of justice. He argues that the district court's inclusion of reimbursed bank account holders in the tally of victims is an error that amounts to a miscarriage of

justice.  That argument is now precluded by the decision we have issued today in <u>Stepanian</u>, No. 08-1053, slip op. at 8-14.  In that case, which is based on the same facts as this one, we conclude that the district court was correct to count the reimbursed account holders as victims for purposes of the multiple victim enhancement.

Given the absence of any error in the court's application of the guidelines, there can be no miscarriage of justice caused by enforcing appellant's waiver of the right to appeal.  Hence, we dismiss his appeal.

<u>            So ordered</u>.