# United States Court of Appeals
## For the First Circuit

No. 08-1053

UNITED STATES OF AMERICA,

Appellee,

v.

MIKAEL STEPANIAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lipez, Hansen,* and Howard,
Circuit Judges.

Barry E. Shulman for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Robert Clark Corrente, United States Attorney, and Lee H. Vilker, Assistant United States Attorney, were on brief, for appellee.

June 26, 2009

*Of the Eighth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.    Appellant pled guilty to conspiracy to commit access device fraud and aggravated identity theft and now appeals his sentence of 72 months of imprisonment. Among other things, this appeal requires us to decide whether individuals who were reimbursed for financial losses are "victims" within the meaning of the multiple victim enhancement set forth at section 2B1.1(b)(2) of the United States Sentencing Guidelines. Concluding that such individuals are "victims" for this purpose, we reject appellant's challenge to the imposition of a six-level guideline enhancement for crimes affecting more than 250 victims. We also reject his claims that the district court erred by giving the guideline sentence range "substantial weight" and by concluding that it was bound to impose a two-year consecutive sentence for the aggravated identify theft conviction.

## I.

The facts are not disputed.  Beginning in January 2007, appellant and three co-conspirators -- Arman Ter-Esayan, Arutyun Shatarevyan, and Gevork Baltadjian -- devised a plan to steal debit card numbers, personal identification numbers ("PIN codes"), and credit card numbers from the customers of 24-hour Stop & Shop grocery stores in Rhode Island.  To accomplish this, they surreptitiously replaced the credit and debit card payment terminals in Stop & Shop checkout aisles with altered terminals. The altered terminals were equipped with devices that recorded, or

-2-

"skimmed," debit card numbers, PIN codes, and credit card numbers whenever customers swiped their cards to make purchases.

After returning to a targeted store to retrieve a converted payment terminal and replacing it with the store's original terminal, the co-conspirators possessed the private account information of every customer who had used the compromised terminal during the intervening period. The men were able to use the stolen information to make unauthorized transactions, including cash withdrawals from automatic teller machines ("ATMs"). Their unauthorized transactions totaled roughly $132,300.

The scheme was discovered in February 2007, when one bank's internal investigation of unauthorized ATM withdrawals revealed that many affected account holders had recently used their cards at Stop & Shop stores in Coventry and Cranston, Rhode Island.[1] Stop & Shop security personnel soon located surveillance video showing Ter-Esayan, Baltadjian, and Shatarevyan entering the Cranston store in the early hours of the morning on February 1, 2007. While Baltadjian engaged the night clerk in conversation, Ter-Esayan and Shatarevyan approached the credit card terminal in a deserted checkout aisle. Shatarevyan quickly disconnected the original terminal from its cables and handed it to Ter-Esayan, who

---

[1] The investigation was also aided when one of the altered terminals malfunctioned and was sent out of the store for servicing. When it was opened for repairs on February 13, 2007, it was discovered that card-skimming equipment had been placed inside the terminal.

concealed it in his coat. Shatarevyan then removed a second terminal from his own coat and connected it to the cables. Stop & Shop surveillance personnel located similar footage of the three men switching terminals in the Coventry and Providence, Rhode Island stores. As revealed by the surveillance video, the process of substitution only took about twelve seconds.

On February 26, 2007, Stop & Shop employees at one of the targeted stores recognized appellant's co-conspirators from the surveillance video and called the police. The responding officers arrested Ter-Esayan, Baltadjian, and Shatarevyan inside the store. They also arrested appellant, who was sitting behind the wheel of a vehicle parked immediately outside the store's exit. Police later searched a nearby hotel room that had been rented in appellant's name, where they found materials used to alter the credit card terminals and a laptop containing the private account information of customers who had shopped at the Cranston and Coventry Stop & Shop stores.

On July 13, 2007, after waiving his right to indictment, appellant pled guilty to a two-count information charging: 1) conspiracy to violate 18 U.S.C. § 1029(a)(2) by trafficking in and using one or more unauthorized access devices with intent to defraud, in violation of 18 U.S.C. § 371 (Count I), and 2) knowing transfer, possession, or use of other persons' means of identification in relation to the felony offenses of access device

fraud, 18 U.S.C. § 1029(a)(2), (a)(3), and conspiracy to commit access device fraud, 18 U.S.C. §§ 371, 1029(b)(2), constituting aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1) (Count II).

The Office of Probation prepared a pre-sentence report ("PSR") that calculated appellant's total offense level for Count I (access device fraud) at 23. This calculation included a base offense level of 6, a ten-level upward adjustment for crimes causing a financial loss of between $120,000 and $200,000, a six-level upward adjustment for crimes involving more than 250 victims, a two-level upward adjustment for use of sophisticated means to commit the crime, a two-level upward adjustment because the offense involved the production or trafficking of an unauthorized access device, and a three-level downward adjustment for acceptance of responsibility. The PSR placed appellant in Criminal History Category I, and the resulting guideline range was 46-57 months on Count I. The report also noted that Count II, aggravated identity theft, carried a mandatory consecutive sentence of two years. 18 U.S.C. § 1028A(b).

At sentencing, the defendant objected to the PSR's calculation of the number of victims of the crime, arguing that individual account holders could not be counted as victims because they were reimbursed by their financial institutions. The district court disagreed:

> [T]here has been loss experienced by all the victims in the case. The loss experienced by the individual victims may have been for a short period of time, might have been for a week or two weeks or for a day, whatever the case may be. There was reimbursement, no doubt, that occurred, but I don't think the guidelines speak in terms of the length of time that a victim is deprived of their money or access to their money any more than in any other crime of fraud or that involves stealing, that the question of whether the person is a victim is determined by whether they're deprived of their resources for an hour, a day, a month or a year . . . . It seems to me these people were victims because money was stolen from their accounts.

The district court adopted the PSR's recommendation, sentencing appellant to 48 months of imprisonment on Count I and a mandatory two year consecutive term on Count II, for a total period of imprisonment of 72 months. This appeal followed.

## II.

Appellant first challenges the district court's calculation of the number of victims of his crime. United States Sentencing Guidelines section 2B1.1 ("section 2B1.1") pertains to economic crimes such as embezzlement, fraud, and some counterfeit offenses, and instructs that a six-level increase should be applied if such an offense involved 250 or more victims ("the multiple victim enhancement"). U.S.S.G. § 2B1.1(b)(2)(C).[2] The application

---

[2] Section 2B1.1(b)(2) also instructs sentencing courts to apply a two-level increase for offenses involving 10 or more but less than 50 victims, and a four-level increase for those involving 50 or more but less than 250 victims. U.S.S.G. § 2B1.1(b)(2)(A) and (B).

-6-

notes accompanying section 2B1.1 define "victim" as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1);[3] or (B) any individual who sustained bodily injury as a result of the offense . . . ." U.S.S.G. § 2B1.1 cmt. n.1. The notes define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense," U.S.S.G. § 2B1.1 cmt. n.3(A)(i).[4] "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm." U.S.S.G. § 2B1.1 cmt. n.3(A)(iii).

Appellant argues that the bank account holders who were reimbursed for their losses were not "victims" for purposes of the multiple victim enhancement because, having been reimbursed, they did not ultimately sustain the "actual loss determined under subsection (b)(1)" of section 2B1.1. U.S.S.G. § 2B1.1 cmt. n.1. The government counters that the there is no requirement that victims bear the final burden of the financial loss, and that it is

---

[3] Subsection (b)(1) prescribes incremental sentence level increases depending upon the amount of loss attributed to the crime. U.S.S.G. § 2B1.1(b)(1).

[4] This definition excludes "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs" and "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, prosecution and criminal investigation of an offense." U.S.S.G. § 2B1.1 cmt. n.3(D).

enough that an individual sustain "any part" of the loss, id., before it is shifted to another individual or entity. Further, the government argues, adopting appellant's argument would contradict the clear intention of the Sentencing Commission to increase penalties according to the severity and impact of economic crimes.

We think the government has the better of the argument. To begin with, we agree with the government that the most natural reading of the phrase "sustain any part of" in the application notes' definition of "victim" does not have a temporal limit or otherwise indicate that losses must be permanent. Although one understanding of "sustain," meaning "to keep up or keep going," The Random House Dictionary of the English Language 1917 (2nd. ed. 1987), does have a temporal dimension, we think the better understanding of the word "sustain" in this context simply means to "undergo" or "suffer." Black's Law Dictionary 1488 (8th ed. 2004) ("Charles sustained third degree burns."). The card holders bore the first part of the total losses before the funds were restored. The direct withdrawal of money from their bank accounts left them unable to access that money for some period of time.[5] This

_____

[5] This case does not require us to address the situation where unauthorized charges made on credit cards are reversed before targets actually pay for the charges. Although this fraud included the theft and use of credit card numbers and debit card numbers, the government took the position in the district court and on appeal that the vast majority of illicit transactions in this case were debit card transactions, and the defendant did not object to that factual characterization. In the absence of such a challenge, the district court was entitled to rely on the government's

immediate unavailability of the account holders' money is "reasonably foreseeable pecuniary harm," U.S.S.G. § 2B1.1 cmt. n.3(A)(i), and within the intended scope of section 2B1.1.

In drawing this conclusion, we reject the position of some other circuits that the account holders did not suffer actual pecuniary harm, "readily measurable in money," because their losses were reimbursed. See, e.g., United States v. Yagar, 404 F.3d 967, 971 (6th Cir. 2005) (concluding that individuals whose funds are eventually reimbursed by financial institutions are not "victims" within the meaning of section 2B1.1 because, having recovered their losses within a short period of time, they do not suffer any "adverse effect as a practical matter.").[6]  The "declaration of victim losses" statements filed in the district court in this case confirm the common-sense conclusion that the individual account holders suffered a real economic loss.  The declarations reveal that one victim who was traveling abroad could not pay her travel

---

assertion that the debit card theft brought the number of victims above 250 even if the credit card victims are excluded from that tally.  See, e.g., United States v. Prochner, 417 F.3d 54, 65-66 (1st Cir. 2005) (a sentencing court is entitled to rely on facts set forth in PSR when defendant has not meaningfully objected to them).  We therefore limit our holding to the situation where money was removed from the accounts of targets through debit card withdrawals.

[6]  See also, United States v. Kennedy, 554 F.3d 415, 419 (3d Cir. 2009) ("account holders did not 'sustain[] any part of the actual loss' because they were reimbursed . . . . "); United States v. Orr, No. 08-7070, 2009 WL 1459570 at *5 (10th Cir. May 27, 2009); United States v. Pham, 545 F.3d 712, 720-21 (9th Cir. 2008); United States v. Conner, 537 F.3d 480, 489 (5th Cir. 2008).

-9-

expenses during the period of the theft.  Another victim described how he and his family had no money for food and gas for a period of time because of the theft, and how their card was denied when they tried to use it to pay for their son's birthday party.  That victim concluded "it put a big financial burden on my family for a few weeks."  Although every victim of the scheme may not have a similarly dramatic story, these declarations provide tangible support for our conclusion that even where losses are reimbursed, unauthorized withdrawals from bank accounts cause real economic harm.[7]

Furthermore, the application notes accompanying section 2B1.1 reflect an understanding on the part of the Commission that the term "victim" includes persons whose losses are reimbursed.  Again, the notes define "victim" as any person who sustains any part of the actual loss calculated under subsection (b)(1) of section 2B1.1.  In explaining how to calculate the subsection (b)(1) loss, the notes state that: "Loss shall be reduced by . . . [t]he money returned . . . by the defendant . . . to the victim before the offense was detected."  U.S.S.G. § 2B.1 cmt. n.3(E)(i).  The notes thus describe a person as a "victim" even though the person's entire losses might be reimbursed by the defendant before

_____

[7] To be clear, our recital of these anecdotes is not meant to suggest that the government must prove the kind of harm described in the letters to establish the applicability of the multiple victim enhancement.  We simply offer these accounts in support of our position that such withdrawals, whatever the particulars of the impact in an individual case, do represent real economic harm.

the detection of the crime.  The Eleventh Circuit also found this language persuasive in <u>United States</u> v. <u>Lee</u>, 427 F.3d 881, 895 (11th Cir. 2005), where it found that reimbursed individuals are "victims" within the meaning of the guideline.  The Eleventh Circuit observed:

> When considering the impact of recovered collateral, or the return of money, property, or services, to the victim, the Guidelines treat those so recovering as having suffered a loss but then allow the defendant to take credit against the total loss for the value of the recovered or returned loss.  Stated another way, inherent in the credit against loss provision is an acknowledgment that there was in fact an initial loss, even though it was subsequently remedied by recovery of collateral or return of goods.

<u>Id.</u> at 895 (citations omitted).[8]

More recently, albeit in an unpublished opinion, the Eleventh Circuit has indicated that <u>Lee</u>'s reading of the guideline

---

[8] The credit against loss application note reads:

<u>Credits Against Loss.</u>--Loss shall be reduced by the following: (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected . . . . (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time the fair market value of the collateral at the time of sentencing.

U.S.S.G. § 2B1.1, cmt. n.3(E).

-11-

would apply beyond the narrow facts of that case.[9]  In United States v. Cornelius, 202 Fed. App'x. 437, 439 (11th Cir. 2006), the court concluded that targets of a bank fraud scheme who were reimbursed shortly after they sustained losses were victims, and remarked that although the losses in Lee "were not short-term or subject to indemnity . . . . this did not detract from [the] conclusion that the Guidelines allow a court to find an actual loss by a reimbursed party, and therefore treat that party as a victim."[10]

Finally, although the rule of lenity may counsel in favor of a defendant's interpretation of an ambiguous guideline,[11] see United States v. Bowen, 127 F.3d 9, 14 (1st Cir. 1997) (applying the rule of lenity where there was "genuine and insurmountable doubt" about the meaning of a guideline provision), that rule is reserved for "those situations in which a reasonable doubt persists about a statute's intended scope even after resort to the language and structure, legislative history, and motivating policies of the statute."  United States v. R.L.C., 503 U.S. 291, 305-06 (1992)

---

[9]  It generally took longer for the Lee victims to recoup their losses than is the case here, and some were never totally reimbursed. Lee, 427 F.3d at 885.

[10]  The Eleventh Circuit, like our own, views its unpublished opinions as persuasive authority but not binding precedent. See 11th Cir. R. 36-2; 1st Cir. R. 32.1.0(a); see also Fed. R. App. P. 32.1.  We cite Cornelius with the recognition that it is persuasive authority but not binding within the Eleventh Circuit.

[11]  Under the rule of lenity, we resolve "grievous ambiguity in a penal statute" in a defendant's favor.  United States v. Councilman, 418 F.3d 67, 83 (1st Cir. 2005).

-12-

(internal quotations and citations omitted; emphasis in original).

Here, the evident policy behind the guideline resolves any potential ambiguity in favor of the government, making the rule of lenity inapplicable. Section 2B1.1 serves Congress's goal of achieving "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of different severity." U.S.S.G. § 1A.1 cmt. Part A, n.3 (emphasis in original). As the government points out, under Stepanian's view,

> [N]one of the people who bore the initial brunt of the crime -- who had their identities and assets stolen -- qualify as victims. Indeed, under his logic, there would only be one victim if a single insurer stood behind the 26 banks and absorbed the losses. The Sentencing Commission could not have intended such a strange result in the case of an enhancement whose evident purpose is to gauge the magnitude of the crime, not to apportion damages, restitution, or tax liability.

We agree. Section 2B1.1's multiple victim enhancement serves the goal of proportionality by increasing penalties for crimes that affect many people. Our reading of the term "victim" comports with that goal by reflecting the magnitude of a crime which imposed "reasonably foreseeable pecuniary harm" on many people within the meaning of the guideline.[12] Accordingly, we affirm the

---

[12] In light of the evident circuit split on this question, the Supreme Court will most likely have to resolve the disagreement, or the Sentencing Commission will have to provide further guidance. In fact, the Sentencing Commission is currently considering the question. See United States Sentencing Commission, Proposed Amendments to the Sentencing Guidelines, 74 Fed. Reg. 4806 (Jan. 27, 2008) (addressing the circuit split and requesting "comment regarding whether § 2B1.1 adequately accounts for a case in which

-13-

district court's decision to impose the six-level multiple victim enhancement for more than 250 victims.[13]

---

an individual suffers pecuniary harm, but the pecuniary harm is immediately reimbursed by a third party."). The fact that the Sentencing Commission is involved in ongoing deliberations about the language of the guideline does not, however, relieve us of our duty to interpret and apply the language of the guideline as it is presently written. We note that the Department of Justice's Office of Policy and Legislation, in a letter responding to the Commission's request for comment, endorsed the position of the Second and Ninth Circuits, thereby taking a position that would be at odds with its argument in this case. However, at oral argument, the United States represented that "to the extent there is any tension or conflict between [the government's] brief and the letter from the Department to the Sentencing Commission . . . [the] brief controls and [the] brief represents the official position of the Justice Department on this issue in the case of people like the ones here who have their money stolen from their accounts by debit and who from our perspective do suffer [a] pecuniary harm, albeit it a temporary one."

[13] Other circuits that have found that temporary losses do not constitute actual pecuniary harm and do not bring their bearers within section 2B1.1's definition of "victim" have nonetheless concluded that secondary financial harms, such as the cost of time spent seeking reimbursement, can render reimbursed individuals "victims" within the meaning of the guideline. See United States v. Abiodun, 536 F.3d 162, 169 (2nd. Cir. 2008) (holding that the cost of time spent seeking reimbursement can render reimbursed individuals victims within the meaning of section 2B1.1, so long as time cost losses are included in the subsection (b)(1) loss calculation); Pham, 545 F.3d at 721 (same). In addition to its primary argument, the government asked that, should we decide that only secondary costs such as time costs would constitute actual harm to the individual account holders, we remand the case for factual development of the secondary costs incurred by account holders as a result of the crime. In light of our acceptance of the government's primary argument, however, we need not reach the question whether secondary costs such as time costs can account for actual loss under subsection (b)(1) and whether they must be included in the calculation of subsection (b)(1) actual loss if their bearers are to be counted as victims.

Appellant also challenges his sentence on the ground that the district court misunderstood its discretion to depart from the sentencing guidelines in light of United States v. Booker, 543 U.S. 220 (2005). "After Booker, the applicable guidelines range is treated merely as advisory and the sentencing court is free to exercise its discretion to impose a reasonable sentence outside the guidelines range that is 'sufficient, but not greater than necessary' based on the factors articulated in § 3553." United States v. Vidal-Reyes, 562 F.3d 43, 49 (1st Cir. 2009) (quoting 18 U.S.C. § 3553(a)).

Appellant cites to nothing in the record indicating that the district court gave undue weight to the sentencing guidelines or otherwise misunderstood its discretion. The court carefully addressed the arguments made at sentencing by appellant's counsel, and stated, "[I will] try to place my decision within the context of the Section 3553 factors, which I'm obligated to consider in determining the appropriate sentence." See 18 U.S.C. § 3553(a) (explaining that "[t]he court shall impose a sentence sufficient, but not greater than necessary" and setting forth several factors to be considered in determining sentence length). The court further stated, "And I think that meting out sentences . . . I do what I think is right and I don't hesitate to go downward if I think it's

the appropriate thing to do. But in this case, I think the guideline sentence is what's called for."

There was no error here. The court understood its discretion to depart from the sentencing guidelines, and imposed a sentence with that understanding in mind.

**IV.**

Lastly, Stepanian challenges the two-year consecutive sentence he received after pleading guilty to aggravated identity theft pursuant to 18 U.S.C. § 1028A. He did not raise this claim in the district court; therefore, our review is for plain error. United States v. Rodriguez-Lozada, 558 F.3d 29, 38 (1st Cir. 2009). We find none.

The elements of aggravated identity theft under 18 U.S.C. § 1028A are: 1) knowing transfer, possession, or use, without lawful authority, of a means of identification of another person, 2) in relation to a felony violation enumerated in subsection (c) of § 18 U.S.C. § 1028A. Appellant frames his argument as a sentencing challenge, claiming that "the sentencing court committed error when it believed it was required to impose a two year consecutive sentence," but his argument seems to take issue with the basis for his conviction for aggravated identity theft.[14] He essentially claims that his conviction for aggravated identity theft was flawed

---

[14] 18 U.S.C. § 1028A prescribes a mandatory consecutive two-year penalty for violators of that statute. The district court correctly understood that a two year consecutive sentence is required for a conviction under § 1028A.

-16-

because he was not independently convicted of an enumerated "in relation to" offense.

Appellant is correct that his conviction in Count I was under the general conspiracy statute, 18 U.S.C. § 371, which is not an enumerated "in relation to" offense under subsection (c) of section 1028A. His conviction, however, was for conspiracy to violate 18 U.S.C. § 1029(a)(2), which is an enumerated crime under subsection (c). For purposes of this appeal we need not determine whether Count I alone would have formed a sufficient basis for the "in relation to" element of the § 1028A conviction, because of appellant's plea of guilty to Count II.

In pleading guilty to Count II, appellant pled guilty to all of the elements of § 1028A aggravated identity theft, including the "in relation to" element. Count II alleged that 1) during and in relation to the felony offenses of access device fraud (18 U.S.C. § 1029(a)(2) and (3)) and conspiracy to commit access device fraud (18 U.S.C. § 1029(b)(2)), appellant 2) "did knowingly transfer, possess, and use, without lawful authority, means of identification of other persons . . . ". All three of those listed offenses (18 U.S.C. § 1029(a)(2), (a)(3), and (b)(2)) are felony violations enumerated in subsection (c)(4) of 18 U.S.C. § 1028A. Appellant therefore pled guilty to using other persons' means of identification in relation to violations of several § 1028A-eligible

-17-

offenses.[15]  There was no error, let alone plain error, in the imposition of the mandatory two-year consecutive sentence for aggravated identity theft.

Affirmed.

---

[15]  To the extent Stepanian wishes to argue that the government must separately allege and charge the predicate crime in order to charge a § 1028A offense (and it is unclear whether this is what he intends to argue), the statutory language lends no support to that proposition. Also, the government draws a persuasive analogy to convictions under 18 U.S.C. § 924 for use of a firearm in relation to other crimes.  In that context, we have held that a defendant "may be convicted for possession of a weapon in furtherance of a drug trafficking crime . . . even if he is acquitted of the underlying . . . crime," because, despite the apparent inconsistency in the jury's verdict, there was "sufficient evidence to sustain a rational verdict of guilty on both counts." United States v. Figueroa-Encarnacion, 343 F.3d 23, 30 & n.4 (1st Cir. 2003).  In this case, where the defendant has pled guilty to committing the "in relation to" offense as an element of the crime of conviction, and there is not even a claim of inconsistency, the case for the conviction's legitimacy is even stronger.