In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1124

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROBERT A. LOFFREDI,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 1040—**Ronald A. Guzmán**, *Judge.*

ARGUED DECEMBER 11, 2012—DECIDED JUNE 18, 2013

Before BAUER, WILLIAMS, and SYKES, *Circuit Judges.*

PER CURIAM. Robert Loffredi appeals his sentence of 78 months' imprisonment for mail fraud, 18 U.S.C. § 1341. He challenges only the district court's imposition of a two-level upward adjustment for an offense involving ten or more victims. *See* U.S.S.G. § 2B1.1(b)(2)(A)(i). We affirm the judgment.

Loffredi owned and operated a securities brokerage firm that offered its customers investments in certificates

of deposit, mutual funds, and Treasury bills. Instead of purchasing the investments requested by his customers, however, Loffredi diverted their money toward his own personal expenses and business debts. Over four years he fraudulently misappropriated approximately $2.8 million from his brokerage customers. One customer alerted the Securities and Exchange Commission to some irregularities in his financial statements, and the ensuing investigation led to an indictment charging Loffredi with five counts of mail fraud. *See* 18 U.S.C. § 1341. He pleaded guilty to one count.

At issue here is the two-level upward adjustment Loffredi received under U.S.S.G. § 2B1.1(b)(2)(A)(i) for an offense involving at least ten victims. The probation officer who prepared the presentence report counted as victims each of the 14 defrauded customers whose funds Loffredi had misappropriated. Loffredi filed written objections to the presentence report, contending that the only victim of the offense was his broker-dealer parent firm, LPL Financial Corporation, which had reimbursed the losses of 12 of the 14 customers (Loffredi reimbursed the other 2). At his sentencing hearing, his attorney did not press the objection but instead argued for a below-guidelines sentence based on the disparity in sentences resulting from a disagreement among the circuits regarding this offense-level adjustment. The district court accepted the presentence report's factual findings, including its calculation of the number of victims, and sentenced Loffredi to 78 months' imprisonment, the top of the guidelines range.

On appeal Loffredi argues that we should side with the other circuits that, he believes, have interpreted the guidelines in a way that would exclude his defrauded customers from the victim tally. The guidelines define "victim" in § 2B1.1(b)(2) as "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. "Actual loss," in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). In *United States v. Panice*, 598 F.3d 426 (7th Cir. 2010), we held that "[v]ictims whose losses were reimbursed sustained an actual loss for the period of time up until the point at which they were reimbursed" and are therefore properly counted as victims under § 2B1.1(b)(2) along with those who reimbursed them. *Id.* at 433; *accord United States v. Stepanian*, 570 F.3d 51, 55-56 (1st Cir. 2009); *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005).

Loffredi argues that we should overturn *Panice* because, he says, other circuits give better effect to the plain meaning of the language in the guidelines. He points in particular to *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), which involved bank-account holders who temporarily lost funds due to the defendant's fraudulent withdrawals but were reimbursed by the bank; the Sixth Circuit held that because their losses were "short-lived and immediately covered by a third-party," the account holders did not sustain any "actual loss," *id.* at 970-72. Other circuits encountering similar circumstances have adopted the same reasoning. *See United States v. Kennedy*, 554 F.3d 415, 419-22 (3d Cir. 2009);

*United States v. Conner*, 537 F.3d 480, 489-91 (5th Cir. 2008); *United States v. Armstead*, 552 F.3d 769, 782 (9th Cir. 2008). Loffredi draws two principles from these cases: (1) the word "sustained" implies some definite duration of loss, and (2) individuals whose losses were reimbursed—and who therefore are not owed restitution in the "actual loss" calculation under § 2B1.1(b)(1)—have not suffered "any part of the actual loss" for the offense and must not be counted as victims, lest the court engage in improper double counting.

We reject Loffredi's argument that a plain reading of the word "sustained" compels the conclusion that a victim's losses must be endured for some minimum period of time. *See Stepanian*, 570 F.3d at 55 (relying on Black's Law Dictionary defining "sustain" to mean " 'undergo' or 'suffer' "); *United States v. Pham*, 545 F.3d 712, 718 (9th Cir. 2008) ("[A]n individual who 'sustained bodily injury as a result of the offense' would still be considered a victim under part B of the definition found in application note 1 to U.S.S.G. § 2B1.1 even if he subsequently recovered from that injury."). We stated in *Panice* that the guidelines' definition of "victim" contains no inherent temporal baseline and does not require that the loss persist through the time of sentencing. 598 F.3d at 433. We are not persuaded by the reasoning of other circuits that infer such a limitation from the text of the guidelines.

Likewise, nothing about the plain meaning of "actual loss" prohibits "double counting." One can sustain "part of" an overall loss even though the financial burden of

the loss has shifted to someone else by the time the defendant goes to court for sentencing because both parties—the initial target of the offense and the party who reimbursed the initial loss—have suffered pecuniary harm that resulted from the offense. The *amount* of the financial loss may not be doubly counted in computing the total amount of restitution, but the number of individuals who bore that loss does not diminish merely because of their eventual reimbursement. Moreover, in the sentencing context, "double counting" is not a disfavored concept; rather, it is a mechanism employed by the guidelines in part to reflect the seriousness of the offense. *See United States v. Vizcarra*, 668 F.3d 516, 518-21 (7th Cir. 2012) ("[T]here is no general prohibition against double counting in the guidelines.").

Loffredi protests that this logic could lead to an endless chain of victims where one victim's loss is continually reimbursed by someone else down the line, creating a gross mismatch between the number of "victims" and the amount of actual loss calculated under § 2B1.1(b)(1). But he overlooks the fact that losses must be reasonably foreseeable to the defendant in order to count as part of the "actual loss" of the offense. *See* U.S.S.G. § 2B1.1 cmt. n.3(A)(iv). So although one person's financial loss may have ripple effects, there will never be an endless chain of "victims" as the guidelines use the term.

Finally, contrary to Loffredi's assertions, *Panice* did not foreclose the possibility that some individuals who suffer an initial, negligible loss before reimbursement may be excluded as victims because their reimburse-

ment was so swift or—perhaps owing to contractual obligations—so certain and complete that they suffered no actual pecuniary harm. *See Stepanian*, 570 F.3d at 55 n.5 (declining to address the "situation where unauthorized charges made on credit cards are reversed before targets actually pay for the charges"); *Kennedy*, 554 F.3d at 419 (excluding account holders from victim tally where government had not shown "that the account holders even knew that their funds had been stolen before they were completely reimbursed"); *United States v. Erpenbeck*, 532 F.3d 423, 442 (6th Cir. 2008) (distinguishing situation in which putative victim had immediate coverage from fraud due to contractual relationship from situation in which victims "eventually had to undertake a class-action lawsuit to seek relief"). We need not explore that threshold in this case, however, because Loffredi's customers' losses were neither short-lived nor minuscule. Loffredi's fraudulent misappropriations went on for years before his customers caught on, and the scheme's success depended on misleading them repeatedly into believing that their funds were secure. Loffredi never asserted that his fraud was painless with respect to his customers; he relied instead on an all-or-nothing defense that the customers cannot be victims because they were reimbursed. For the reasons stated, we reject that contention.

AFFIRMED.