In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3323

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANK PANICE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cr-00876-1—**Charles P. Kocoras**, *Judge.*

ARGUED SEPTEMBER 17, 2009—DECIDED MARCH 17, 2010

Before ROVNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Frank Panice's greed got the better of him. He pled guilty to twenty counts arising out of one fraudulent scheme and he stipulated to the offenses arising out of another scheme. The district court sentenced him to 360 months' imprisonment, which was within the Guidelines range. Panice appeals his sentence. We vacate the sentence and remand for resentencing.

## I. Background

Frank Panice and six codefendants were charged on December 1, 2005, in a ten-count indictment with mail and wire fraud and criminal copyright infringement. The charges arose out of an advance fee scheme to defraud persons seeking jobs in the technology sector. The scheme took place from April 2001 through December 2002. As part of the scheme, Panice offered interviews and promised jobs to applicants, provided they completed a training course that cost between $250 and $450. However, there were no jobs to be had, and the course was designed in such a way that it could not be completed. Hundreds paid the fee. Panice claimed that he hired six or seven people, but in reality, those persons were hired to hustle the program to others. Panice refused to refund the money paid, and he and his cohorts pocketed the fees. The case was assigned to Judge Robert W. Gettleman, see *United States v. Panice*, No. 05-CR-972 (N.D. Ill.), and is referred to as the "Receiver case."

Panice also engaged in another fraudulent scheme, this time an investment scheme, from late 2003 and continuing until his arrest in December 2006. Panice created an entity called "Bank Watch," purportedly a financial services company, and advertised that Bank Watch invested in CDs insured by the FDIC. Bank Watch did not invest a single penny of investor money. Panice and codefendant Brian Jines (also a codefendant in the Receiver case) kept the money for themselves. Panice and Jines communicated, and caused others to communicate, several false and fraudulent representations to

Bank Watch investors and prospective investors to induce them to invest with Bank Watch. At least eighty-seven victims sent more than $5.4 million to Bank Watch. Panice was involved in this scheme while out on bond on the Receiver case. As a result of this scheme, Panice faced twenty counts, including mail fraud, interstate transportation of stolen securities, money laundering, and structuring of currency transactions. This case was assigned to Judge Charles P. Kocoras and is referred to as the "Bank Watch" case, see *United States v. Panice*, No. 06-CR-876 (N.D. Ill.). This appeal is from the "Bank Watch" case.

Panice pled guilty to all charges against him in the Bank Watch case. At his change of plea hearing on February 21, 2008, the government said that the parties had an agreement to put on the record. Government counsel stated:

> The government agrees to dismiss the indictment in the Receiver Corp case . . . on three conditions.
>
> The first one is that he [Panice] admits sufficient facts to form the factual basis of a plea in the Receiver Corp case; second, is that he agrees that that offense will constitute a stipulated offense, for purposes of the Sentencing Guidelines; and, the third condition is that he agrees to any restitution ordered by you for the Receiver Corp case.

Panice's attorney asked for clarification of the distinction between "stipulated conduct" and "relevant conduct," and the Assistant United States Attorney explained: "certain things are aggregated, if there is a stipulated—the loss amount will be aggregated; the number of victims, and

such; and, that, essentially, it is that he was convicted of that case for purposes of these Guidelines, not that it was only considered for relevant conduct."

The court questioned Panice: "Did you get the three conditions now on which that indictment will go away; but, it, in effect, will be measured in terms of your possible punishment in this case? Do you understand that?" Panice answered, "Yes, sir." Then the court reiterated the three conditions including that "this offense conduct [in the other case] constitutes a stipulation . . . which has an effect on various calculations, as well as affording restitution to be ordered in my case for conduct engaged in in the other case." The court again asked Panice whether he understood; Panice said he did. Then after Panice was sworn, the court stated:

> [Y]ou have a plea agreement in this case, even though it is not in writing. You understand that; do you not? And that is the plea agreement we talked about. The . . . other indictment . . . being dismissed on the satisfaction of the three conditions Ms. Nasser outlined and which I have just repeated for you. Do you understand that?

Panice answered, "yes," and the court added, "So, that is a binding plea agreement."

Thus, Panice stipulated to the facts and offenses charged in the Receiver case. He admitted under oath that "I am, beyond a reasonable doubt, . . . guilty of the offenses charged in the indictment" in the Bank Watch case. Panice agreed that Bank Watch had "87-some investors" and that a total of "5 million-some dollars" were sent to Bank

Watch. Later, in response to the prosecutor's concern that Panice had to admit to other facts to support a guilty plea, the court stated that Panice "has admitted that he got money from 87 investors, to the tune of $5 million." Panice made no objection.

Panice also stated that "[w]ith respect to the indictment [in the Receiver case], I plead guilty to having participated together with Brian J[i]nes and Tony Volz in the offense as charged in that indictment." Panice said he thought between $160,000 and $200,000 was received from that scheme. He claimed that six or seven persons got jobs, but subsequently admitted that those people were hired to hustle the program to other applicants.

On August 19, 2008, Judge Kocoras sentenced Panice to a within-Guidelines sentence of 360 months' imprisonment (the range was 360 months to life). The judge ordered restitution of $4,915,683.52, which included $4,826,358.52 for Bank Watch victims and $89,325 for Receiver victims.

## II. Discussion

Panice challenges his sentence only. He makes several arguments: First, he asserts that the district court's determination of the number of victims, which resulted in an increase to his offense level under U.S.S.G. § 2B1.1, was erroneous; he claims that he should have been given a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1; he submits that the court denied him his right to allocution before imposing the sentence; he contests

the court's calculation of the amount of restitution; and, finally, he argues that the court presumed that a within-Guidelines sentence was reasonable and failed to consider what sentence was appropriate for him in light of the sentencing factors of 18 U.S.C. § 3553(a).

We review the district court's findings of fact at sentencing and applications of the Guidelines for clear error. *United States v. House*, 551 F.3d 694, 701 (7th Cir. 2008). When a defendant argues that the district court made a procedural error, such as failing to appreciate the Guidelines' advisory nature or failing to consider the § 3553(a) factors, we review the sentencing procedures de novo. *Id.* If the district court's sentencing procedures were sound, then we consider whether the sentence was substantively reasonable. *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010).

### A. Number of Victims & U.S.S.G. § 2B1(b)(2)(C)

Panice argues that the district court erred in calculating the number of victims to be 250 or more. U.S.S.G. § 2B1.1(b)(2)(C) instructs courts to apply a 6-level increase to the offense level if the offense involved 250 or more victims. The application notes define "victim" to include "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* n.3(A)(i). And "reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew, or under the circumstances, reasonably

should have known, was a potential result of the offense." *Id.* n.3(A)(iv). Panice raises several challenges to the number of victims, but we find no error.

Panice argues that the Receiver victims should not be counted because they were not victims of Bank Watch. Under the Guidelines, stipulated offenses are treated as offenses of conviction and are properly included in the offense level calculations. *See United States v. Eske*, 925 F.2d 205, 207 (7th Cir. 1991); U.S.S.G. § 1B1.2(c) & cmt. n.3. Panice admitted to facts sufficient to predicate a finding of guilt as to the conduct and charges in the Receiver case, and he has a binding plea agreement in which he agreed that the conduct in that case constituted stipulated offenses. Therefore, the court did not err in counting the Receiver victims in the victim total.

Next, Panice argues that the government failed to prove by a preponderance of the evidence that there were 212 Receiver victims. In considering evidence at sentencing, a court is not subject to a strict application of the rules of evidence. *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). The district court "may consider information that has 'sufficient indicia of reliability to support its probable accuracy.'" *Id.* (quoting *United States v. Abdulahi*, 523 F.3d 757, 761 (7th Cir.), *cert. denied*, 129 S. Ct. 265 (2008)). In finding the number of victims in the Receiver case, the district court relied on the representation of Assistant United States Attorney ("AUSA") John Podliska, the prosecutor in the Receiver case, that the Judgment and Commitment order ("J&C") entered by Judge Gettleman against Tony Volz in that case listed

212 victims to whom restitution was ordered. Podliska had a copy of the J&C entered by Judge Gettleman as supporting documentation. The J&C had sufficient indicia of reliability to support its probable accuracy, so the district court could rely on it. *See id.* And Panice had stipulated to the conduct charged in the Receiver indictment.

The district court had other reliable information about the number of Receiver victims. Panice's Presentence Investigation Report ("PSR") stated that according to the government's version of the offense, the Receiver scheme had 439 victims. The district court may rely on facts presented in the PSR if the PSR is based on sufficiently reliable information. *Id.* The defendant bears the burden of proving that the PSR is inaccurate or unreliable. *Id.* If he has no evidence to question the PSR's accuracy or reliability, the court may rely on the PSR. *Id.* Panice offered no evidence to counter the PSR's assertion of 439 Receiver victims; all he had was his bald assertion that there were fewer than 212 victims. This was insufficient. *See id.*

Moreover, Panice's own statements support the finding that there were more than 212 Receiver victims. During his change of plea hearing, the court asked Panice how much money he received from the training course fees; Panice answered, "I think $160,000 to $200,000." The record shows that the fee ranged from $250 to $450. If we assume that everyone paid the higher fee and take $160,000 as the amount of money received, then there would be 355 victims. Panice stated at his plea hearing that the fee had been $250 and was increased to $450, so we

know that all of the victims did not pay the higher fee. The actual number of victims would be even higher if we knew what number of victims paid which fee.

Panice also argues that the 221 victims who recovered their application fees from the credit card companies should not have been considered victims under U.S.S.G. § 2B1.1. He cites *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), a bank fraud case, for support. The *Yagar* defendant stole checks drawn on various accounts and used them to deposit money into the accounts of 50 persons, using stolen bank information. After depositing the checks, she withdrew a portion of the deposited funds. *Id.* at 968. The *Yagar* court held that account holders who only temporarily lost funds because their banks reimbursed them for their losses were not victims within the meaning of U.S.S.G. § 2B1.1. *Id.* at 971. The court acknowledged that there could be cases in which a person could be a victim even if ultimately reimbursed, but reasoned that where the monetary loss was short-lived and immediately covered by a third-party, there was no "actual loss" or "pecuniary harm." *Id.* The record does not disclose how quickly the 221 victims of Panice's fraud recovered their fees, but the record does not suggest that it happened immediately. Furthermore, *Yagar* is not binding on us and we are not persuaded by its reasoning.

In our view, the fact that the victims were eventually reimbursed does not negate their victim status. The application notes to § 2B1.1 support the conclusion that "victim" includes a person whose losses were reim-

bursed. The definition of "victim" in the notes contains no temporal restriction; nor does it state that the loss must be permanent. Victims whose losses were reimbursed sustained an actual loss for the period of time up until the point at which they were reimbursed. Other circuits have adopted the view that a victim who is reimbursed for his or her loss is a victim within the meaning of U.S.S.G. § 2B1.1(b)(2). *See, e.g.*, *United States v. Stepanian*, 570 F.3d 51, 55-58 (1st Cir. 2009) (reimbursed account holders); *United States v. Lee*, 427 F.3d 881, 895 (11th Cir. 2005) (mail fraud victims). *But see United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009) (concluding that account holders who were fully reimbursed before they even knew their funds were missing were not "victims" within the meaning of § 2B1.1 because they suffered no pecuniary harm); *United States v. Conner*, 537 F.3d 480, 489 (5th Cir. 2008) (concluding that fully-reimbursed account holders were not victims under § 2B1.1).[1]

Panice criticizes the court for telling his counsel that he did not have a "straight-face" argument about the number of victims. According to Panice, this violated Federal Rule of Criminal Procedure 32(i)(1)(C) and (D) and U.S.S.G. § 6A1.3. However, Panice's attorney offered nothing to counter the reliable victim information on

---

[1]   In any event, these 221 individuals need not be included in the number of victims to warrant a 6-level increase under § 2B1.1(b)(2)(C), because, as we shall see, Panice waived any right to challenge the court's finding that there were 87 Bank Watch victims. (212 Receiver victims plus 87 Bank Watch victims equals 299 victims.)

which the court relied. We cannot say that the court's assessment of the weakness of this defense argument was inaccurate.

Panice argues that the district court erred in concluding that there were 87 Bank Watch victims; he claims the number was only 46. He challenges the inclusion of spouses (which adds 23 victims, without whom there would have been 64 victims). He also argues that eight other individuals should not be counted as victims: six who stopped payment on their checks or intercepted them in the mail before they were negotiated, and two who were fully reimbursed on their investments plus interest. (These eight were excluded from the actual loss computation and the restitution order.) And Panice identifies two other groups of people—ten persons total—he thinks should not be counted as victims: those whose funds were among the last to be deposited into Bank Watch accounts at National City Bank, which were administratively frozen in August 2005, and those whose funds were the last ones deposited in eleven other banks and seized by the government in November 2006.

Yet, Panice admitted that there were "87-some" Bank Watch victims. During his plea hearing, the court said, "[T]here were 87-some investors. You may not know the exact number, but that sounds about right; does it not?" Panice answered, "Yes, sir." Later, the court recapped that Panice "admitted that he got money from 87 investors," and there was no objection or clarification by Panice's counsel. And, at sentencing when the parties were discussing the number of victims, Panice's attorney effectively

conceded that the number of victims in the Bank Watch case was 87:

> Court: The first problem is the 250 is not predicated solely on that [Receiver] fraud scheme. We have the Bank Watch case. That is part of the game.

> Counsel: That is 87.

Panice argues that his attorney was just reiterating that 87 victims were attributed to the Bank Watch case and was not conceding that there were in fact 87 victims. This argument is not persuasive in light of the context in which the statement was made and the fact that his attorney did not then dispute the number of Bank Watch victims. Instead, Panice's counsel argued over the number of victims in the Receiver case. And even later still, the court summarized its understanding as follows: "in our case, the number is 87 . . . we are talking numbers of people here—87, which I do not understand to be in dispute." Panice's counsel said nothing then to disabuse the court of its understanding. Thus, Panice has waived any right to challenge whether the number of Bank Watch victims was 87. But even if Panice had not waived this right and the number of Bank Watch victims was reduced to 46, the total number of victims is still more than 250, and six levels were properly added to Panice's offense level under U.S.S.G. § 2B1.1(b)(2)(C).

Panice contends that the Sarbanes-Oxley Act of 2002 was aimed at "serious fraud" and was not intended to cover run-of-the-mill Ponzi schemes such as his. Thus, he submits that the district court should have disre-

garded U.S.S.G. § 2B1.1(b)(2)(C). The Sarbanes-Oxley Act was enacted to protect investors and build confidence in U.S. securities markets. *See* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (stating that the Act is to "protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws, and for other purposes"); *Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 7 (1st Cir. 2006). Though not on the same level as Enron or WorldCom, Panice's schemes were serious frauds and bilked investors of millions of dollars. The Sarbanes-Oxley Act reaches Panice's misconduct. Perhaps consideration of the stiffer penalties under the Sarbanes-Oxley Act and the Enron and WorldCom cases would weigh in favor of a "downward departure" for Panice. But such a consideration would be more appropriately given by the district court when evaluating the sentencing factors, particularly § 3553(a)(6)—the need to avoid unwarranted sentencing disparities.

Finally, Panice argues the application of the victim enhancement offends the ex post facto clause. The amendment to U.S.S.G. § 2B1.1 became effective January 25, 2003; Panice's conduct in the Receiver case occurred from 2001 to 2002. This argument is foreclosed by *United States v. Demaree*, 459 F.3d 791, 795 (7th Cir. 2006) (holding that the application of the Guidelines in effect at sentencing rather than at the time of defendant's conduct does not violate the ex post facto clause even if the current Guidelines suggest a harsher sentence because the Guidelines are only advisory, not binding). *See also United States v. Nurek*, 578 F.3d 618, 625-26 (7th Cir.) (reaffirming

*Demaree*), *petition for cert. filed*, (U.S. Dec. 11, 2009) (No. 09-8147).

The district court did not err in finding that the offense involved more than 250 victims; it correctly applied the six-level increase to Panice's offense level under U.S.S.G. § 2B1.1(b)(2)(C).

## B.  Acceptance of Responsibility Under U.S.S.G. § 3E1.1

Panice argues that the district court erred in not giving him a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. We review the court's decision to deny a defendant this reduction for clear error. *United States v. Acosta*, 534 F.3d 574, 581 (7th Cir. 2008); *see also* U.S.S.G. § 3E1.1 cmt. n.5.

Section 3E1.1 provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). ("'Offense' means the offense of conviction and all relevant conduct under § 1B1.3 . . . unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 cmt. n.1(H).) Merely pleading guilty does not entitle a defendant to an acceptance of responsibility reduction. *United States v. Krasinski*, 545 F.3d 546, 554 (7th Cir. 2008). The Guideline's Application Notes state that in deciding if a defendant is entitled to a reduction, factors the court may consider include whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully

admitt[ed] . . . any additional relevant conduct"; voluntarily terminated or withdrew from criminal conduct; voluntarily paid restitution before an adjudication of guilt; and voluntarily assisted authorities in recovering the fruits and instrumentalities of the offense(s). U.S.S.G. § 3E1.1 cmt. n. 1(a)-(c), (e); *see also United States v. Silvious*, 512 F.3d 364, 370 (7th Cir. 2008) (holding that defendant was not entitled to reduction for acceptance of responsibility where he failed "to fully account for the proceeds of his crime and attempt[ed] to delay a long-scheduled hearing based on an incredible claim of innocence"); *United States v. Dillard*, 43 F.3d 299, 306 (7th Cir. 1994) (concluding that the defendant's conduct was inconsistent with acceptance of responsibility where he was less than truthful and did not give a complete statement of his involvement in the offense or account for the proceeds he received).

The district court determined that Panice did only the minimum necessary to accept responsibility, but not enough to earn a reduction under § 3E1.1. The judge noted that Panice pled guilty. However, after reading the PSR and other materials and looking back at the plea hearing transcript, the judge wondered whether he and Panice had been talking about the same conduct. The judge also highlighted the fact that Panice "did not lift a finger" to right the wrongs he had done to the victims, remarking: "Silence. No cooperation." In particular, the judge commented that Panice did not account for the proceeds of the fraud or attempt to assist the government in recovering any of the victims' money. Thus, the judge expressly relied on two factors identified by the application notes—truthful admission of offense conduct

and voluntary assistance to authorities—in deciding that Panice was not entitled to a reduction for acceptance of responsibility.

We find no error in the district court's determination that Panice barely admitted the facts necessary to predicate a finding of guilt in this case. The sentencing transcript and record support the finding that Panice was less than candid in admitting his involvement and participation in the fraud schemes. For example, in explaining his involvement in Bank Watch, Panice claimed that he believed he would be able to make things right, when he knew all along that none of the money would be invested in CDs. He also denied that the scheme was phony from the get-go, but then admitted he never did what he promised to do with investors' money. With respect to the Receiver case, Panice was evasive when the court asked him if he told people he had jobs for them, which was untrue; Panice claimed he was building teams for Computer Associates. He also claimed that the training program was completable and that six or seven people found jobs. He eventually conceded, when confronted, that those people were hired to hustle the program to others. And when the court questioned Panice whether he did "anything to make it right," Panice asserted: "We did pay everybody back in the end." But this was a result of a class action lawsuit, not because of any voluntary payment by Panice. Nor do we find any error in the court's determination that Panice failed to account for the proceeds of his frauds and wholly failed to assist the government in the

recovery of the victims' money. The court was right: Panice didn't lift a finger to help.

Panice asserts that the district court placed unjustified and unrealistic emphasis on restitution and remorse. He does not contend that these factors are inappropriate considerations—they most certainly are. *See United States v. Grasser*, 312 F.3d 336, 339-40 (7th Cir. 2002) (indicating that voluntary payment of restitution prior to adjudication of guilty can be a basis for an acceptance of responsibility reduction); *United States v. Johnson*, 227 F.3d 807, 816 (7th Cir. 2000) (noting that a "sense of remorse . . . should be attendant to an acceptance of responsibility"); U.S.S.G. § 3E1.1 cmt. n.1(c). And we have no quarrel with the district court's appraisal of Panice's failures in these areas.

He also complains that the sentencing judge did not permit him to address the judge before deciding Panice had not earned a reduction for acceptance of responsibility. Panice's attorney requested that Panice be allowed to make a statement before the court made "a final decision." The court responded, "I am not sentencing. . . . [W]e are discussing an issue where the facts are extant and his statement is not going to help me resolve that issue."[2] The court continued: "I will let him speak because we still have the harder decision about what the right sen-

---

[2] It seems that the court understood counsel's reference to "final decision" to mean the ultimate sentence to be imposed. Counsel did not specify that Panice wanted to read the statement before the court decided whether Panice was entitled to an acceptance of responsibility reduction.

tence is in this case. But he is not entitled [to] acceptance." The fact that was "extant" in the court's mind was that Panice had not made any effort to get the victims' money back or find out where it went. Panice offered nothing in his statement at sentencing, and offers nothing even now on appeal, to refute that fact. Panice also had the opportunity to submit sentencing papers prior to the sentencing hearing in which he could argue for a reduction for acceptance of responsibility. And he did.

Panice submits that he never had an opportunity to speak on the acceptance of responsibility issue. That is incorrect. As the district court said it would, it gave Panice an opportunity to speak. Panice took advantage of that opportunity and claimed that he was deeply remorseful for the pain he had caused the investors. He also claimed that he would do his best to make restitution upon his release. He did not, however, rebut the fact that he had done nothing whatsoever to assist in the recovery of any of the money taken from the victims. He merely denied that he had any of the victims' money. Even assuming Panice does not have a stash of cash hidden away somewhere, not having the money and refusing to assist the government in tracking down the money are not the same thing.

Furthermore, the court imposed no limitation on what Panice could say during his allocution; nothing prevented him from addressing the matters that he believed were pertinent to acceptance of responsibility. Because the Guidelines are advisory only, had Panice said something that demonstrated to the court that he

truly had accepted responsibility for his criminal actions, then the court could have taken that into account in deciding whether a within-Guidelines sentence was appropriate. Or, the court might have reconsidered its earlier finding that Panice had not done enough to earn a reduction for acceptance of responsibility. But Panice offered nothing of the sort.

Panice argues that he accepted responsibility for the offenses for which he pled guilty and that the Receiver case, whether considered relevant conduct or stipulated conduct, should not have affected acceptance of responsibility in the Bank Watch case. The problem with this argument is that he admitted to facts sufficient to predicate a finding of guilt as to the conduct and charges in the Receiver case, and he has a binding plea agreement in which he agreed that the conduct in that case constituted stipulated offenses. As a result, Panice waived any right he may have had to challenge whether the court could consider his conduct in the Receiver case in deciding whether he had earned a reduction for acceptance of responsibility. *See United States v. Hampton*, 585 F.3d 1033, 1044 (7th Cir. 2009) (stating that waiver is the intentional relinquishment or abandonment of a known right). Therefore, in determining whether Panice was entitled to a reduction for acceptance of responsibility, the district court did not err in considering Panice's acceptance of responsibility for the conduct and offenses committed in the Receiver case. Even the fact that Panice makes this argument on appeal, after he agreed that his conduct in the Receiver case constituted stipulated offenses, is yet another indication that he has not fully

accepted responsibility for his criminality. *See United States v. Roche*, 415 F.3d 614, 617 (7th Cir. 2005) (concluding that defendant's argument that he was entitled to acceptance of responsibility, after he had agreed to a limited waiver of his appeal right, which included waiver of the argument that he should be granted a reduction for acceptance, showed he had not fully accepted responsibility). The district court's determination that Panice did not qualify for a reduction for acceptance of responsibility was not clearly erroneous.

### C.  Right of Allocation and Federal Rule of Criminal Procedure 32

Panice argues that he was denied his right to a meaningful allocution. In particular, he complains that the district court did not permit him to read a written statement before making a final decision on acceptance of responsibility. He also suggests that the court had already decided that it would impose "the stiffest sentence possible under the Guidelines" before giving Panice a chance to speak. Panice did not object at sentencing, so we review for plain error. *United States v. Noel*, 581 F.3d 490, 501 (7th Cir. 2009). Thus, we look for an error that was plain and affected Panice's substantial rights. *Id.* We find no error here.

Under Federal Rule of Criminal Procedure 32, "[b]efore imposing sentence, the court must . . . address the defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence . . . ." Fed. R. Crim. P. 32(i)(4)(A)(ii); *see also Noel*,

581 F.3d at 502 (finding plain error in district court's failure to directly address the defendant at sentencing). We have held that a district court must give a defendant a "meaningful opportunity to address the court prior to the imposition of sentence." *United States v. Luepke*, 495 F.3d 443, 444 (7th Cir. 2007). In *Luepke*, we concluded that the defendant was denied that right because the court definitively announced the sentence of 240 months' imprisonment and then later invited the defendant to speak before imposing the sentence it had just announced. *Id.* at 445, 450. Here, in contrast, before imposing sentence, the district court addressed Panice personally and permitted him to speak in an attempt to mitigate his sentence. True, the court had already determined that the Guidelines range was 30 years to life. But the court did not announce where in (or out of) that range Panice's sentence would fall before Panice was allowed to speak. Panice was not denied the right to a meaningful allocution.

According to Panice, the district court decided that it would impose the stiffest sentence possible under the Guidelines before he was allowed to make a statement. The sentence imposed, however, reveals this claim is false. The court sentenced Panice at the low end of the range. Had the judge already decided to impose the stiffest sentence possible, it would have sentenced him at the upper end of the range. The fact that the judge sentenced Panice to the low end of the Guidelines range suggests that Panice's statements may have influenced the sentence imposed.

Panice complains that the judge did not allow him to address the court at the point during sentencing when

counsel were arguing whether a reduction for acceptance of responsibility was warranted. The judge said that the "facts are extant" and whatever Panice had to say relative to acceptance of responsibility was "not going to help . . . resolve that issue." A defendant's right of allocution is not unlimited. *United States v. Alden*, 527 F.3d 653, 663 (7th Cir. 2008) (stating that the court may limit the defendant's allocution to the purpose of Rule 32). The court did not err in refusing to allow Panice to speak at that particular point in the hearing. The court subsequently gave both the defense and the government an opportunity to raise "anything of a factual nature" that was related to the Guidelines calculations. Both sides said they had nothing to raise. Had Panice wanted to present further information regarding the acceptance of responsibility issue, he could have. He didn't.

### D. Amount of Restitution

Panice challenges the amount of restitution ordered by the district court. We review the district court's authority to order restitution de novo and review the amount of restitution ordered for an abuse of discretion. *United States v. Hosking*, 567 F.3d 329, 331 (7th Cir. 2009). Panice argues that restitution should not have been ordered to the Receiver victims because the Receiver scheme was not part of the Bank Watch scheme for which he was convicted. He claims that the government failed to prove that the Receiver victims were owed $88,895. And he argues that the amount of restitution ordered for Bank Watch is erroneous because it included $607,509.39 of

investor funds for which payment was stopped or which were returned to investors as well as $872,555 that were seized under the forfeiture order.

The Mandatory Victim Restitution Act provides that when sentencing a defendant convicted of a certain offense, "the court shall order . . . that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1). In addition, "[t]he court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense." *Id.* § 3663A(a)(3); *see also United States v. Peterson*, 268 F.3d 533, 534 (7th Cir. 2001). As described above, Panice entered into a plea agreement in which he agreed to make restitution to the Receiver victims as ordered by the district court. Thus, the court had the authority to order Panice to make restitution to the Receiver victims. To the extent that Panice claims he had to agree to the *specific* amount of restitution to be awarded, his claim fails. *Peterson* teaches that the plea agreement need not specify the final amount of restitution to be ordered by the court. *Id.* at 534-35.

Panice also disputes the amount of restitution owed. At his change of plea hearing, he claimed that he sent some of the Receiver victims refunds and that "[t]hey were all paid by the end." But then he was less certain, testifying that "I thought they were all paid. I might be mistaken." Panice asserts that his counsel argued that "most, if not all, Receiver victims recovered or were reimbursed the application fees." But argument does not replace evidence or other reliable information. Panice offered no

evidence to refute the factual assertion in the PSR that the outstanding loss in the Receiver case was $88,895. This assertion was based on the representation by AUSA Podliska, the prosecutor in the Receiver case. At Panice's sentencing, Podliska stated that at least $88,000 in restitution was ordered in the Receiver case. He said that the judgment in Tony Volz's case listed the victims and the amount of restitution owed each, reflecting a total "close to $90,000." Panice's counsel claimed that he had never seen "the document"—a copy of Volz's J&C—but did not object to the court's consideration of it or to AUSA Podliska's representations.

A district court "may rely on the information contained in the PSR so long as it is well supported and appears reliable." *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009). Panice had the burden of showing that the PSR was inaccurate or unreliable. *See id.* A "bare denial of its accuracy" does not discharge this burden. *Id.* (quotation omitted). The government has the burden of demonstrating the accuracy of such information only when a defendant "creates real doubt" as to the information's reliability. *Id.* at 795-96. As stated, the prosecutor's representations formed the basis for the PSR's conclusion that the actual loss in the Receiver case was $88,895. The information in the PSR was backed up by AUSA Podliska's statements at the sentencing hearing and Volz's judgment. Neither Panice's assertions at his guilty plea hearing nor his arguments at sentencing created real doubt as to the reliability of the information that the actual loss was $88,895. Panice had the opportunity to present additional information at his sentencing hearing

regarding the amount of restitution that should be made. And the court specifically asked the parties whether there was anything of a factual nature in the PSR that they took exception to, and Panice's counsel said there was not.

Panice's claim that the district court violated Federal Rule of Criminal Procedure 32(i)(1)(C) and (D) and U.S.S.G. § 6A1.3 is incorrect.[3] The loss to the Receiver victims was not reasonably in dispute, and Panice had a sufficient opportunity to present information to the court regarding the amount of restitution outstanding in the Receiver case. But Panice points out a discrepancy in the amount of restitution ordered to the Receiver vic-

---

[3] Rule 32 provides in part: "At sentencing, the court: . . . (C) must allow the parties' attorneys to comment on the probation officer's determinations and other matters relating to an appropriate sentence; and (D) may, for good cause, allow a party to make a new objection at any time before sentence is imposed."

Section 6A1.3 provides in part:

(a) When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor. . . . [T]he court may consider relevant information . . . provided that the information has sufficient indicia of reliability to support its probable accuracy.

(b) The court shall resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(i), Fed. R. Crim. P.

tims. The judgment orders Panice to pay $89,325 to the Receiver victims; however, Volz's judgment in the Receiver case ordered restitution of $88,895—a difference of $430. The government has not offered an explanation for the difference, and we presume it is a typographical error which can be corrected on remand.

As for Panice's objection to the restitution ordered to Bank Watch victims, the government responds that the investors whose funds were frozen had not yet been reimbursed at the time of Panice's sentencing. The government represents that once the funds are disbursed to the victims, Panice will get credit and the amount of restitution owed will be reduced accordingly. But the government does not respond to Panice's argument regarding the $607,509.39 of investor funds for which payment was stopped or the investors were reimbursed. It would be improper to order Panice to make restitution for amounts that already were returned to victims or for which payments were stopped.

We note, too, that there is a discrepancy in the amount to be paid. A document attached as Exhibit 5 to the Government's Version of Events, entitled "Appendix A Summary of Investors," prepared by Special Agent Mark Lischka, shows that $582,509.39 of investor funds were stopped or returned. The PSR relied on the Government's Version in asserting that the actual loss from the Bank Watch scheme was $4,822,494.61. At sentencing, the district court ordered restitution to the Bank Watch victims in the sum of $4,822,494.61, presumably in reliance on the PSR and Government's Version.

Yet, Government's Exhibit 43, a document entitled, "Accounting for Disposition of Funds Bank Watch," also prepared by Agent Lischka and presented at sentencing, reflects that $607,509.39 in investor funds were stopped or returned. Thus, it seems that $25,000 in additional funds were returned to investors between the time Agent Lischka prepared Exhibit 5 and Exhibit 43, and the district court inadvertently relied on the earlier documentation. This error can be corrected on remand as well.

Moreover, the order of restitution in Panice's Judgment includes a total of $4,826,358.52 for Bank Watch victims, which is $3,863.91 more than the amount in the PSR and the Government's Version. The reason for this discrepancy is not explained. Assuming the inclusion of the additional sum is an error, this, too, can be corrected on remand.

### E. Presumption of Reasonableness and Consideration of § 3553(a) Factors

Finally, Panice argues that the district court treated the Guidelines as presumptively reasonable and appropriate and failed to adequately consider the § 3553(a) sentencing factors. In our post-*Booker* world, *see United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are advisory. The district court may not presume that a within-Guidelines sentence is reasonable. *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (per curiam) ("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable."); *Gall v. United States*, 552

U.S. 38, 50 (2007). When sentencing, the district court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson*, 129 S. Ct. at 891-92. We are not confident based on the record that the district court did not treat a within-Guidelines sentence as presumptively reasonable.

The seasoned district judge obviously knew that the Guidelines are advisory. He first noted that the Guidelines "are advisory in nature, and Section 3553 guides my determination of the appropriate sentence." The judge said that when he thinks the Guidelines do not provide a fair sentence, he is not advised by them and he was "quite aware of the discretion" that he had. The judge said, "if I could articulate reasons where I could ignore the Guidelines, I will do that."

However, the judge also said a few things that suggest that he may have inadvertently slipped into the mode of applying a presumption of reasonableness to the Guidelines range. He said:

> . . . I guess I just keep talking because *I do not want to get to where I have to go here, but I have to go there. I have to.*

> I am going to apply the Guidelines in this case. The low end, yes, but the low end is awfully high. And I make no pretense that it is not. But I do not know what else to do here because you gave me no choice.

(Emphasis added). Then the judge said:

> And he [Panice's attorney] had to deal with *the statutory scheme that is presumptively reasonable.* Even the cases that have been cited to me say that. So, that is where we start; and, in this case, that is where we end.
>
> So, it is with my own personal anguish that I am going to impose the following sentence, but I have to do it because the facts and circumstances of this case and justice compels it. . . .
>
> Your sentence will be . . . 360 months . . . .

(Emphasis added).

The government acknowledges that the judge's remarks are subject to a variety of interpretations. And we are unsure precisely what the judge meant. The government asserts that the record as a whole reveals that the judge was well aware that the Guidelines were not mandatory, but advisory. It is correct that the judge stated the premise that the Guidelines are merely advisory, but that is beside the point. *See Nelson*, 129 S. Ct. at 892 (reversing Fourth Circuit's judgment upholding defendant's sentence where the sentencing court stated that the Guidelines are advisory but presumptively reasonable). While the judge's comments show that he knows the Guidelines are advisory (of which we had no doubt because he is an able and experienced district judge), some of his remarks, noted above, leave us to wonder whether he treated them as presumptively reasonable in this case.

And we have the additional concern that the judge did not give adequate consideration to the § 3553(a) sentencing

factors in deciding the appropriate sentence. Panice contends that he argued subsection (a)(1)—the nature and circumstances of the offense and the history and characteristics of the defendant—and tried to argue subsection (a)(6)—the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct—but was cut off by the court. Of particular concern is whether the judge gave meaningful consideration to § 3553(a)(6). The transcript of the sentencing hearing does reflect that the judge did not seem receptive to considering the need to avoid unwarranted sentence disparities. He stopped Panice's lawyer short as he was trying to make a comparison to Conrad Black, who was convicted by a jury of mail and wire fraud and obstruction of justice.[4] Black's fraud resulted in a loss of $6.1 million. Black's case came out of the same district as Panice's, and Black was sentenced to 78 months' imprisonment. Panice also asserted that the

---

[4] At sentencing, the court quickly rejected the comparison, saying that "he [Black] paid back $30 million. Okay? . . . [T]his is a fundamental factual feature which distinguishes this case from that case." Courts can consider whether a defendant has accepted responsibility and his cooperation with the government in deciding on an appropriate sentence. Such conduct can lead to a warranted sentencing disparity. *See, e.g., United States v. Bartlett*, 567 F.3d 901, 907-08 (7th Cir. 2009) (addressing disparities in sentences of codefendants), *cert. denied*, 78 U.S.L.W. 3113 (U.S. Jan. 19, 2010) (No. 09-302). But here, it is unclear whether the court gave meaningful consideration to the § 3553(a)(6) factor or simply rejected the comparison out of hand.

district court should consider the likely sentence for his codefendant, Brian Jines, which the parties anticipated would be approximately 90 months. (Jines pled guilty to one count of mail fraud and one count of unlawful structuring of transactions related to Bank Watch and, like Panice, stipulated to the offenses charged in the Receiver case. In October 2008, Judge Kocoras sentenced Jines to 89 months' imprisonment. Jines had received a reduction for acceptance of responsibility and apparently cooperated with the government and assisted in the recovery of victims' funds.)

In addition, on appeal Panice identified several defendants convicted of conduct similar to his to show the alleged unwarranted sentencing disparities:

(1) John and Timothy Rigas, convicted by a jury of 18 counts including fraud and conspiracy; loss in excess of $100 million; sentenced in 2005 to 15 and 20 years, respectively (following appeal, reversal on one count, and remand, they were resentenced in 2008 to 12 and 17 years);

(2) Jeffrey Skilling, former CEO of Enron Corporation, convicted by a jury of 29 counts of conspiracy, fraud and other offenses; sentenced in 2006 to 24 years and 4 months' imprisonment and ordered to pay $45 million in restitution; and

(3) Bernard Ebbers, former CEO of WorldCom, Inc.; largest accounting scandal in the United States that pre-dated Bernard Madoff; convicted in 2005 of 9 felonies including conspiracy and securities

fraud; over $1 billion loss to investors; sentenced
to a below-Guidelines sentence of 25 years.[5]

Other comparators are found in *United States v. Parris*, 573
F. Supp. 2d 744, 747, 748 (E.D.N.Y. 2008) (defendant
brothers were convicted by a jury of conspiracy,
securities fraud, and witness tampering and sentenced
to 60 months; the amount of the loss was approximately
$4.9 million and there were more than 500 victims), and
the Exhibit A thereto, *id.* at 756-62.

Of course, we can appreciate the difficulty faced by a
sentencing judge in addressing "the need to avoid unwar-
ranted sentence disparities." But a careful review of the
sentencing materials and transcript leaves us with the
impression that the court did not give adequate consider-
ation to the disparities between Panice's sentence and
those given to other white collar criminals such as Conrad
Black, the Rigas brothers, and even codefendant Jines. (We
understand that Jines cooperated and assisted in the
recovery of funds, but the judge did not explain why
Panice's sentence needed to be four times longer than
Jines'.) The amount of loss caused by Skilling and Ebbers
is much, much greater than that caused by Panice, yet their
sentences are significantly shorter than Panice's.[6] In

---

[5] These defendants and their sentences were identified by the
government in its sentencing memorandum and attached
exhibit.

[6] Bernard Madoff is in a league of his own. He pled guilty to
eleven counts of fraud, money laundering, perjury, and other

(continued...)

addition, the district court may have been thinking in "either/or" terms: either Panice would get a Guidelines sentence, or he would get the 60 months for which he advocated. The judge's comments at sentencing make it difficult for us to know whether he gave meaningful consideration to whether the sentencing factors justified a sentence between these two extremes. Our concern about whether the judge treated the Guideline range as presumptively reasonable and whether he approached the sentence from an "either/or" perspective is illustrated by his sentencing comments quoted above.

Although a sentencing judge need not articulate the § 3553(a) factors in a checklist fashion, *United States v. Perez*, 581 F.3d 539, 548 (7th Cir. 2009), the judge "is required to consider the § 3553(a) factors and to address any substantial arguments the defendant made," *United States v. Mendoza*, 576 F.3d 711, 721 (7th Cir. 2009). Here, it is not clear that the judge gave meaningful consideration to the factors argued by Panice—his history and characteristics, including his lack of criminal history, his offense was nonviolent, and other positive characteristics supported by the testimony of Professor Gerald Hills, Ph.D. and Panice's teaching and lecturing of other inmates at the Metropolitan Correctional Center in Chicago.

---

[6] (...continued)

offenses; he defrauded thousands of investors of approximately $65 billion over seventeen years; and he was sentenced to 150 years.

As noted in *Parris*, defendants "who were not coopera-
tors and were responsible for enormous losses were
sentenced to double-digit terms of imprisonment (in
years); those whose losses were less than $100 million
were generally sentenced to single-digit terms." *Parris*, 573
F. Supp. 2d at 753. Panice didn't cooperate with the
government in recovering money for investors, but he did
plead guilty and took some responsibility. And the
losses he caused, even when viewed in the light least
favorable to him, were less than $5 million. The govern-
ment points out that Panice committed the Bank Watch
fraud while he was out on bond awaiting trial for the
fraud in the Receiver case. This certainly weighs in favor
of a lengthier sentence in order to promote respect for the
law and protect the public. *See* 18 U.S.C. § 3553(a)(2)(A),
(C). Nonetheless, and despite the loss and pain to many
victims caused by Panice's greed, a 360-month sentence
seems out of line with the sentences imposed on other
defendants convicted of similar conduct.

The government cited *United States v. Tucker*, 232 Fed.
Appx. 597 (7th Cir. 2007), in urging us to affirm. The
district court in that case made a similar misstatement
about the Guidelines range being presumptively reason-
able. We affirmed, finding that the court "thoroughly
discussed several of the factors listed under" § 3553(a),
including the seriousness of the offense and the defen-
dant's extensive criminal history, and noted his medical
condition. We cannot say that the district court "thor-
oughly discussed" several of the § 3553(a) factors in
Panice's case. Instead, the court focused on the pain that
Panice had caused so many people and the fact that

millions of dollars remained uncovered; these are worthy concerns, no doubt. However, in addressing only the effect of the losses, the court did not demonstrate that the chosen sentence was "sufficient, but not greater than necessary, to comply with the purposes" of 18 U.S.C. § 3553(a)(2).

A within-Guidelines sentence is entitled to a rebuttable presumption of reasonableness. But the sentencing record here leaves too much doubt about whether the judge impermissibly started with that presumption and whether he completed adequate consideration of all the relevant § 3553(a) factors, as we have discussed. Therefore, we cannot affirm this sentence on that presumption. On remand the district judge may still conclude that a 360-month sentence is reasonable when considered in light of all of the relevant § 3553(a) factors. But such a stiff sentence would need to be justified by the articulation of sufficient reasons.

### III. Conclusion

For the foregoing reasons, we VACATE Panice's sentence and REMAND for resentencing consistent with this opinion.