In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3354

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES A. SCALZO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:12-cr-00262-LA-1 — **Lynn Adelman**, *Judge.*

ARGUED FEBRUARY 18, 2014 — DECIDED AUGUST 21, 2014

Before ROVNER, WILLIAMS, and TINDER, *Circuit Judges.*

ROVNER, *Circuit Judge.* James A. Scalzo pled guilty to one
count of bank fraud, in violation of 18 U.S.C. § 1344, and one
count of money laundering, in violation of 18 U.S.C. § 1956.
The district court sentenced him to thirty-five months' impris-
onment, and ordered him to pay restitution in the amount of
$679,737.23. On appeal, Scalzo challenges only the restitution
order. We affirm.

**I.**

In 2008 and 2009, Scalzo was employed as a bank officer, first at Fox River State Bank (the "Bank") in Burlington, Wisconsin, and then at Consumers Cooperative Credit Union (the "Credit Union"), in Round Lake Beach, Illinois. Between April 1, 2008 and October 31, 2009, he originated and approved multiple loans for unknowing and unqualified borrowers without adequate supporting financial information or collateral. On the basis of these loans, he was charged in a two-count Information with a scheme to defraud. As part of that scheme, he forged borrowers' signatures on loan documents, redirected funds from the loans to his own personal use without the knowledge of the borrowers, and took funds from some fraudulent loans to pay off balances on previous fraudulent loans in order to conceal the original fraud. The Information listed nine loans as part of the scheme, six from the Bank and three from the Credit Union. Although Scalzo pled guilty to the Information that listed all of these loans as part of his fraudulent scheme, he objected to the inclusion of two of the Credit Union loans in the court's restitution order. He asserted that the government lacked a sufficient factual basis to establish that these two loans were fraudulent in nature, and he complained that these loans were not part of the negotiated plea with the government. Because the guidelines range was the same whether or not these loans were counted as part of the scheme, the court deferred ruling on restitution and sentenced Scalzo to a term of imprisonment. The court then invited further briefing on the disputed loans and notified the parties that it intended to rule on restitution in ninety days.

Less than a week later, the government supplemented the Presentence Investigation Report ("PSR") with additional information explaining the two disputed Credit Union loans, and filed a "Restitution Memorandum" describing the role of these two loans in Scalzo's overall fraud scheme. According to the government's submissions, on June 25, 2008, while working at the Bank, Scalzo originated a loan in the amount of $230,000 for P.D., a man with a low credit score and no collateral.[1] Scalzo skimmed $35,500 off of P.D.'s loan and deposited it into an account associated with Scalzo, in which P.D. had no interest. Similarly, on July 25, 2008, Scalzo arranged a $125,000 Bank loan for C.P., without supporting documentation as to the credit-worthiness of C.P. or the value of his collateral. Scalzo siphoned $8500 from this loan for himself. Scalzo later told C.P. that he needed to refinance the loan, and on October 13, 2008, Scalzo arranged a second loan for C.P. in the amount of $158,000, again from the Bank. This time, Scalzo took $7500 for his own use. Neither borrower was aware that Scalzo had misappropriated funds from their loans for his own use.

Eventually, the Bank began to investigate P.D.'s loan and determined that P.D. had a poor credit score and that there was no collateral supporting the loan. The Bank contacted P.D. to insist that he provide collateral, which he could not do. Between April and August 2009, the Bank frequently contacted P.D. seeking payment on his then-delinquent loan. By August 2009, Scalzo had left the Bank and was working for the Credit Union. In September 2009, Scalzo suggested to P.D. that he

---

[1] We will follow the government's convention of identifying non-culpable persons by their initials.

obtain a Credit Union loan in order to pay off the Bank loan. Scalzo then generated a loan to P.D.'s parents, K. and P.D., Sr., in the amount of $250,000, without ever meeting these new borrowers. The collateral supporting that loan was a laundromat owned by P.D.'s parents. Scalzo used an appraisal of the laundromat from Wade Graves of Valuation Services, Inc., who valued the property at $137,000, and the business and equipment at $457,000. Scalzo had a regular working relationship with Graves, but P.D.'s parents never met Graves and were never asked to supply information about the laundromat to Graves. The business valuation was based on assertions (the record does not reveal who made these assertions) that the laundromat grossed $500 per day and had a net income of $89,425 per year. Although P.D.'s parents agreed to the loan, they expected P.D., their impecunious son, to make the payments. Had they been asked for information about the value of the laundromat, they would have revealed that the land was worth approximately $100,000, that the business had never generated $500 per day and had never netted $89,425 per year. Instead, the business had been marginally profitable for the first four or five years of its twenty-year existence but had then begun to lose money. P.D.'s parents had been trying without success to sell the laundromat for several years.

In the same time period that the Bank was investigating the loan to P.D., C.P. defaulted on his $158,000 Bank loan, and the Bank determined that there was insufficient collateral to cover the loan. In the summer of 2009, after the Bank contacted C.P. repeatedly regarding the loan, Scalzo called C.P. and advised him that he needed to "pay off the [Bank] loan quickly." To accomplish this, Scalzo arranged a Credit Union loan for C.P.

in the amount of $230,000. C.P. pledged as collateral the same property that the Bank had determined was insufficient to support the $158,000 loan. As with the Credit Union loan to D.B.'s parents, C.P.'s loan application contained an inflated appraisal of that property from Wade Graves.

According to the government's additional brief on restitution, the proceeds of these two Credit Union loans were used to pay off the earlier, fraudulent Bank loans. But D.B.'s parents and C.P. then defaulted on the Credit Union loans, causing losses to the Credit Union totaling $493,710.23. The Credit Union's insurer, CUNA Mutual Group, covered $468,710.23 of the loss and the Credit Union absorbed a $25,000 deductible.

Although the district court told the parties that it intended to defer ruling on restitution for ninety days, the court did not set a specific briefing schedule for any additional submissions on the restitution issue. The government, as we noted above, filed its additional brief within a week of Scalzo's sentencing. Having received no additional briefing from Scalzo for 82 days, the court decided to rule on restitution. Relying on the PSR, the plea agreement and the government's additional submissions, the court found that Scalzo arranged the Credit Union loans in order to conceal the fraud related to the Bank loans. The court noted that the Credit Union loans to P.D.'s parents and to C.P. had been listed as part of the fraudulent scheme detailed in the Information to which Scalzo pled guilty, that both loans went into default status, and that the Credit Union and its insurer lost a substantial amount of money. Namely, CUNA Mutual Group paid a "dishonest employee" claim of $468,710.23, consisting of a $218,715.23 loss on C.P.'s Credit Union loan, and a $249,995 loss on the loan to P.D.'s parents. The Credit

Union itself lost the $25,000 deductible on its insurance policy. To these amounts, the court added losses associated with other loans that Scalzo does not challenge on appeal. Although Scalzo had not responded to the court's invitation to specifically brief his position on restitution, the court noted that Scalzo had earlier objected to including the two Credit Union loans as relevant conduct at the time of sentencing. Scalzo argued at that time that these two loans were not themselves fraudulent. The court rejected that claim, noting that Scalzo pled guilty to the Information that included these two loans as part of the fraudulent scheme. The court found that the loans were in fact fraudulent because they were originated in order to conceal the earlier fraud, that the borrowers then defaulted and that the losses to the Credit Union and insurer would not have occurred but for Scalzo's fraud. The court also concluded that Scalzo "knew or should have known" that the borrowers who had defaulted on the earlier Bank loans had little or no ability to pay the Credit Union loans. The court faulted Scalzo for never meeting with P.D.'s parents and for relying on a patently inflated appraisal of the collateral. As for the loan to C.P., the court found that Scalzo relied on the same collateral that had been found insufficient to secure a smaller loan at the Bank. The court ordered restitution in the amount of $679,737.23, a figure that included $493,710.23 from the two disputed Credit Union loans.

A few days after the court ruled, Scalzo's attorney filed a brief on the issue of restitution. The government filed a short letter in reply. The court determined that Scalzo's additional brief was untimely, but because the government had an opportunity to reply and thus was not prejudiced by Scalzo's

late brief, the court accepted Scalzo's brief. In that brief, Scalzo argued again that the disputed loans were not fraudulent, that during plea negotiations the government represented that there were no losses related to those loans, and that there was no meeting of the minds in the plea agreement on the two disputed loans. Scalzo contended that there was no evidence that he knew or should have known that the appraisals of the collateral were inflated. Nor did the government identify any false information in the loan files. Scalzo explained that he did not object to the inclusion of those loans in the Information or the plea agreement because neither loan affected the guidelines range. In reply, the government noted that, not only did both the Information and the plea agreement expressly list the two loans as part of the fraudulent scheme, the plea agreement also stated:

> The defendant agrees to pay restitution as ordered by the court. The defendant agrees that such restitution shall include any losses sustained by [the] Bank and [the] Credit Union as the result of fraud attributable to the defendant in the loans he originated while in their employ during the time period encompassed by the information; … and losses sustained by any other person directly harmed by the defendant's conduct in furtherance of the fraud scheme.

R. 3, at 17.

The court then issued a second order, reaffirming the initial restitution order. R. 21. The court rejected Scalzo's contention that the government had failed to demonstrate fraudulent conduct with respect to the disputed loans because (1) Scalzo

pled guilty to an Information that listed these loans as part of the fraudulent scheme; (2) the evidence demonstrated that the loans were made in an effort to cover up earlier fraud at the Bank; (3) the loans helped conceal from the borrowers that Scalzo had skimmed money for himself from the original Bank loans; and (4) Scalzo made the loans with the knowledge that the borrowers had little or no ability to pay and that the collateral was insufficient. The court also concluded that the Credit Union and its insurer were victims under the Mandatory Victim Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, and that the plea agreement also supported an award of restitution for losses to the Credit Union and its insurer. The court therefore upheld its earlier restitution order. Scalzo appeals.

## II.

On appeal, Scalzo challenges the restitution award on three grounds. First, he contends that the court erred when it failed to make a complete accounting of the loss to CUNA, the Credit Union's insurer. Second, he maintains that the Credit Union loans to P.D.'s parents and to C.P. were not criminal in nature and therefore should not be included in the restitution order. And third, he asserts that the government did not prove by a preponderance of the evidence that he caused CUNA's loss. The MVRA "requires certain offenders to restore property lost by their victims as a result of the crime." *Robers v. United States*, 134 S. Ct. 1854, 1856 (2014). The district court's authority to order restitution is reviewed *de novo*. *United States v. Hosking*, 567 F.3d 329, 331 (7th Cir. 2009). We review the district court's determination of the restitution amount for abuse of discretion, viewing the evidence in the light most favorable to the govern-

ment. *United States v. Orillo*, 733 F.3d 241, 244 (7th Cir. 2013); *United States v. Swanson*, 483 F.3d 509, 516 (7th Cir. 2007). "We will disturb a restitution order only if the district court relied upon inappropriate factors when it exercised its discretion or failed to use any discretion at all." *United States v. Havens*, 424 F.3d 535, 538 (7th Cir. 2005).

Although Scalzo challenged the inclusion of the two loans in the restitution order, he did not challenge the specific amount awarded or the factual basis for the amount in the district court. Normally, we would limit our review in these circumstances to plain error, but the government has waived Scalzo's forfeiture by responding to his argument on the merits. *United States v. Prado*, 743 F.3d 248, 251 (7th Cir. 2014); *United States v. Tichenor*, 683 F.3d 358, 363 (7th Cir. 2012). We will therefore address the merits.

Restitution awarded under the MVRA is governed by the procedures set forth in 18 U.S.C. § 3664:

> For orders of restitution under this title, the court shall order the probation officer to obtain and include in its presentence report, or in a separate report, as the court may direct, information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim, any restitution owed pursuant to a plea agreement, and information relating to the economic circumstances of each defendant.

18 U.S.C. § 3664(a). *See also Hosking*, 567 F.3d at 332 (the district court is required to base its restitution order, to the extent practicable, on a complete accounting of the loss). "If the presentence report or other report of the loss is insufficient for this purpose, the court may require additional documentation or hear testimony." *Hosking*, 567 F.3d at 332–33. *See also* 18 U.S.C. § 3664(d)(4). In this instance, the PSR specified that CUNA Mutual Group lost $468,710.23 on the Credit Union loans to C.P. and to D.B.'s parents. That is less than the $480,000 total of the original amount loaned. When combined with the $25,000 deductible absorbed by the Credit Union, however, the total loss exceeds the original loan amount by approximately $13,700. Scalzo speculates that this amount might include costs that are not qualified as losses under the MVRA or that were not proximately caused by his actions.

In determining the amount of restitution due, a "district court 'may rely on the information contained in the PSR so long as it is well supported and appears reliable.'" *United States v. Panice*, 598 F.3d 426, 439 (7th Cir. 2010) (quoting *United States v. Heckel*, 570 F.3d 791, 795 (7th Cir. 2009)). A defendant bears the burden of showing that the PSR is inaccurate or unreliable, and a simple denial of its accuracy does not discharge this burden. *Panice*, 598 F.3d at 439. The burden of demonstrating the accuracy of the restitution information in the PSR shifts to the government only when a defendant creates real doubt as to the information's reliability. *Panice*, 598 F.3d at 439; *Heckel*, 570 F.3d at 795–96. Our review of the PSR and supplemental materials demonstrates that the court did not abuse its discretion in relying on the information supplied by CUNA to the probation officer. The PSR specifies that these losses were

related directly to the loans themselves. CUNA informed the probation officer that the company did not include in the loss amount the $50,000 litigation costs that the company incurred. The Credit Union itself included only the amount it lost as a deductible on its insurance policy and did not include staff time, legal costs or increased insurance premiums it incurred as a result of Scalzo's actions. Nor did it include a $40,000 fee it paid to a consultant to review its business practices or any other costs that it had yet to ascertain. The district court did not specifically address the $13,700 difference between the loan totals and the restitution ordered, and Scalzo did not raise it until the appeal. At oral argument, the government explained that the difference might be attributable to a third Credit Union loan to borrower M.S. but that the district court had no opportunity to explore the issue because Scalzo did not object to the amount of restitution on this basis below. In the absence of any such objections below, the district court did not abuse its discretion in relying on the well-supported and apparently reliable loss information presented in the PSR. *Panice*, 598 F.3d at 439.

Nor is there any basis to Scalzo's claim that the two challenged loans were not criminal in nature. As the district court noted, Scalzo pled guilty to an Information that listed these two loans as part of the overall bank fraud scheme. *See* 18 U.S.C. § 1344.[2] The plea agreement also listed these two loans

---

[2]   Section 1344 provides: "Whoever knowingly executes, or attempts to execute, a scheme or artifice – (1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property

(continued...)

as a direct part of the charged fraud scheme. *See United States v. Randle*, 324 F.3d 550, 556 (7th Cir. 2003) ("we distill three situations in which restitution is authorized under the MVRA: first, to a victim directly harmed by the offender's 'specific conduct that is the basis of the offense of conviction'; second, to a victim who is directly harmed by the offender's conduct in the course of committing an offense that involves 'as an element a scheme, conspiracy, or pattern'; third, if the parties so agreed in a plea agreement"). By pleading guilty, Scalzo admitted the essential elements of the offense, one of which was a scheme to defraud that expressly included these loans. *United States v. Kilcrease*, 665 F.3d 924, 929 (7th Cir. 2012) (a guilty plea provides an adequate factual basis for the essential elements of the offense). "An unconditional guilty plea is not ordinarily considered a forfeiture. It is a knowing, voluntary relinquishment of the defendant's right to go to trial and contest the factual basis of an indictment." *United States v. Adigun*, 703 F.3d 1014, 1022 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 2046 (2013). Scalzo now claims that he did not agree with the plea agreement's characterization of these loans as fraudulent but explains that he did not object to their inclusion because the amounts of these loans did not affect his guidelines sentencing range. But having admitted the facts in the Information through his plea agreement and through his answers to

---

[2] (...continued)

owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both."

the court during his change-of-plea colloquy, Scalzo may not now deny them.

Moreover, the district court specifically found that the loans played a significant role in the overall fraud scheme by serving to obscure the fraudulent nature of three earlier Bank loans and also to conceal from the borrowers that Scalzo had helped himself to some of the original loan proceeds. Under the MVRA, the Credit Union and its insurer are entitled to recover losses incurred as part of the overall scheme. *See* 18 U.S.C. § 3663A(a)(2) ("For the purposes of this section, the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme … any person directly harmed by the defendant's criminal conduct in the course of the scheme … ."). Additionally, in some cases restitution may be ordered for certain direct and foreseeable consequences of a crime, even if the conduct at issue does not constitute an element of the crime itself. *United States v. Rand*, 403 F.3d 489, 494 (7th Cir. 2005). Whether the Credit Union losses are characterized as occurring in the course of the charged scheme or as a direct and foreseeable consequence of the scheme, the court did not abuse its discretion in including these amounts in the restitution calculation.

Finally, we reject Scalzo's claim that the government failed to prove by a preponderance of the evidence that he caused the losses to the Credit Union and its insurer. Scalzo complains that the losses were the result of the borrowers' defaults, not any criminal conduct on his part. Victims seeking to recover their losses from a defendant must prove that the defendant

caused the loss, and must demonstrate that the loss would not have occurred but for the defendant's misconduct. *United States v. Allen*, 529 F.3d 390, 396 (7th Cir. 2008). We have already concluded that these loans were criminal in nature, as Scalzo conceded in his plea agreement and as the district court correctly found. As for causation, perhaps the most revealing evidence in the record is that CUNA paid the claims under the "dishonest employee" provision of the Credit Union's insurance policy, recognizing that the losses were caused by actions Scalzo took that were contrary to his employer's interests in originating these loans. R. 16, at 3. Scalzo made the loans to borrowers he knew were poor risks, using inflated appraisals of their collateral, in order to conceal earlier fraudulent loans at the Bank. According to the PSR, Scalzo urged both C.P. and P.D. (and his parents) to borrow from the Credit Union in order to pay off their defaulted loans at the Bank once the Bank began investigating the loans and pressing for payments. That the unqualified borrowers then defaulted on the new loans was an easily anticipated consequence of the scheme.[3] The Credit Union and its insurer would not have suffered losses on these two loans but for Scalzo's fraudulent scheme. In short, the district court did not abuse its discretion in concluding that Scalzo caused the losses to the Credit Union and its insurer.

AFFIRMED.

---

[3] Indeed, if Scalzo had not arranged the Credit Union loans to pay off the fraudulent Bank loans, the Bank would have suffered the loss instead of the Credit Union. Scalzo may not avoid liability for his fraud by simply shifting the loss from one financial institution to another.